**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

MARK GREGROY HANDY, SR.                    *

Petitioner                                           *

v                                                        *              Civil Action No. RDB-14-1820

FRANK B. BISHOP, JR., et al.                 *

Respondents                                        *
                                                    ***

**<u>MEMORANDUM OPINION</u>**

In their initial answer to the above-captioned Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. §2254, Respondents asserted that the petition was subject to dismissal because some of the claims asserted were not exhausted. ECF 3. Upon review of Petitioner's Reply (ECF 5) in which he asserted all of the claims raised were exhausted and, to the extent a claim was considered unexhausted, he waived consideration of that claim, this Court required Respondents to supplement the Answer with additional records and to address the merits of the claims asserted. ECF 12. Respondents filed the amended Answer (ECF 16) and Petitioner has filed additional motions which remain pending (ECF 14 and 19). The Court finds no need for an evidentiary hearing. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2011); *see also Fisher v. Lee*, 215 F. 3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. §2254(e)(2)). For the reasons set forth below, the Petition for Writ of Habeas Corpus shall be denied and a Certificate of Appealability shall not issue.

<u>Petitioner's Motions</u>

Petitioner filed a Motion for Default Judgment (ECF 14) based on his assertion that Respondents had failed to timely file the supplemental response as required by this Court's

Order.  Respondents, however, sought and were granted an extension of time in which to file the supplemental response.  *See* ECF 13 and 15.  Petitioner's Motion for Default Judgment shall therefore be denied.

Petitioner filed a Motion to Dismiss and Reply to Respondents' Answer (ECF 19) asserting in part that because Respondents failed to address the merits of his claim that counsel was ineffective for failing to anticipate changes in the law in the supplemental response, they are in default and he is entitled to federal habeas relief on this ground alone.  Petitioner seeks dismissal of Respondents' Answer and entry of default judgment in his favor.  *Id.*

Respondents' Supplemental Response shall be considered with the initial Response in totality.  The failure to address the claim asserted is not fatal to Respondents' claim that federal habeas relief is unwarranted and, for reasons set forth more fully below, the claim asserted by Petitioner is without merit.  The Motion to Dismiss shall be denied, but the Reply shall be considered in the context of the dispositive review of the claims raised.

<u>Facts Established at Trial</u>

Petitioner Mark Gregory Handy, Sr. ("Handy") was tried before a jury in the Circuit Court for Baltimore City on February 4 and 5, 2008.  ECF 16 and Ex. 13 and 14 (trial transcripts).  Handy was convicted on charges of attempted first degree murder, attempted second degree murder, first degree assault, and second degree assault.  ECF 3 at Ex. 1 and 2.  On April 1, 2009, Handy was sentenced to life in prison on the attempted first degree murder conviction and sentenced to concurrent terms on the remaining convictions.  ECF 16 at Ex. 15 (sentencing transcript).

At trial it was established that Handy was acquainted with the victim's wife, Tyra Brown Bell,[1] and had given her a ride home in late August or early September of 2006.  ECF 16 at Ex. 13, pp. 190 - 192.  Mrs. Bell testified she had known Handy for about seven or eight years through a mutual friend.  *Id*. at p. 190.  She further testified that at the time she entered Handy's car she had in her possession her cell phone which was equipped with a "chip" owned by her sister.  *Id*. at p. 194.  Mrs. Bell explained that she realized the phone was missing as soon as she got home, but could not call Handy because the phone did not accept incoming calls and she did not have Handy's phone number, nor did she have an additional phone to call him if she had it. *Id*. at pp. 194 – 95.

Mrs. Bell testified that she saw Handy again and asked for the phone back, but he claimed he did not have it with him and would return it later.  *Id*. at pp. 194 - 95.  Later, while Mrs. Bell was in Alabama, she received a phone call from her sister, who was irate over her phone bill.  *Id*. at pp. 196 - 97.  Mrs. Bell recalled that the carrier for the cell phone service would not turn the service off on the phone until they "caught" Handy using the phone, despite her sister's report that the phone had been lost.  *Id*. at p. 197.  Mrs. Bell also recalled that the bill was approximately $1500.  *Id*.

In order to assist her sister, Mrs. Bell called some of the phone numbers on the cell phone bill in an effort to get a message to Handy that he was responsible for the bill and that she needed to see him as soon as possible.  *Id*. at pp. 198 - 200.   Following those calls, Mrs. Bell stated that Handy came to her apartment on October 3, 2006, approximately five days after she had contacted the numbers reflected on the bill.  *Id*. at p. 201.  She explained he arrived at

---

[1]        At the time of trial, Ms. Bell was married to the victim Rodney Bell, but at the time the crime was committed she was his girlfriend.

approximately 4:30 in the afternoon and, in addition to herself, four of her minor children and Rodney Bell were at the apartment. *Id*. at 201 - 202.

Mrs. Bell recounted that she heard a banging on her door and initially thought it was her neighbors upstairs, but her two year old child told her someone was at the door. *Id*. at p. 202. Mrs. Bell looked out her window, recognized Handy's silver Lexus parked outside, and concluded that it was Handy at the door. *Id*.

Mrs. Bell stated that when she opened the door, Handy took a swing at her but she moved in time to avoid contact. *Id*. at pp. 202 - 203. Although Mr. Bell was also near the door at the time, he did not witness Handy taking a swing at Mrs. Bell. *Id*. at pp. 203 - 205. Mrs. Bell and Handy engaged in an argument about the phone bill. Handy offered a credit card to pay the bill, but Mrs. Bell explained that payment of the bill would need to be addressed with her sister. *Id*. at pp. 209 - 10. Mrs. Bell then went back into the house to retrieve Rodney Bell's cell phone so she could call her sister and resolve the issue regarding the bill. *Id*. at p. 211.

According to Rodney Bell's testimony, he was attempting to mediate the dispute between Handy and Mrs. Bell. ECF 16 at Ex. 14, pp. 59 – 60. When he heard Mrs. Bell ask Handy why he swung at her, Mr. Bell turned his attention to Handy to ask him why he had done that. *Id*. at pp. 60 - 61. At this point in the encounter, Mrs. Bell testified that her child had begun climbing the steps to where the three were standing and she turned her attention to the child. ECF 16 at Ex. 13, p. 212. Mrs. Bell recalled hearing sounds of a "tussle." *Id*.

Mr. Bell testified that at the moment Mrs. Bell turned away, Handy stabbed him and the two began fighting. ECF 16 at Ex. 14, pp. 62 - 63. Mr. Bell testified he was "fighting for his life" and did not realize at first how badly he had been hurt. *Id*. at p. 63. When he realized he was seriously hurt, Mr. Bell ran across the street to a wooded area, but Handy followed him and

4

continued to stab him.  *Id*. at pp. 63 – 64.  Mr. Bell recalled hearing Mrs. Bell screaming at Handy to stop his assault and he testified that when Handy stopped stabbing him, he was standing at the place where he ran to escape.  *Id*. at pp. 70 and 73.  At that point Mr. Bell said he was holding his side together and when he looked down he could see the food he had eaten earlier that day seeping out of the wound in his abdomen, along with copious amounts of blood. *Id*. at pp. 70 – 72 and 74.  Neither Mr. or Mrs. Bell could describe the knife used by Handy to stab Mr. Bell.[2]  *Id*. at Ex. 13, p. 218; Ex. 14, p. 92.

Over objection by defense counsel, Mr. Bell stood before the jury shirtless and pointed out all the scars he had incurred as a result of the stabbing, as well as those caused by the numerous surgeries he required.  ECF 16 at Ex. 14, pp. 65 – 69.  Additionally, both Mr. and Mrs. Bell provided testimony regarding the nature of Mr. Bell's injuries and the medical procedures he underwent.  *Id*. at  Ex. 13 at pp. 228 – 241; Ex. 14 at pp. 75 – 81.  The testimony was permitted over objection by defense counsel.  During Mr. Bell's testimony, the trial court issued a cautionary instruction to the jury reminding them that Mr. Bell was not a physician and that his testimony was only his understanding of his medical situation.[3]  *Id*. at Ex. 14, p. 79.

The defense's theory of the case was that Handy did not commit the assault on Mr. Bell; rather, Mrs. Bell assaulted Mr. Bell after Handy left.   On cross-examination, Mrs. Bell was asked about a proceeding in the District Court for Baltimore City where she pled guilty to possession of a deadly weapon and received probation before judgment. *Id.* at Ex. 14 pp. 20 – 33. In that proceeding, evidence that Mrs. Bell was in possession of a machete on April 3, 2007, was

---

[2]     On cross-examination, Mr. Bell was question about his testimony from the April case involving Mrs. Bell's possession of a machete.  ECF 16, Ex. 14 at pp. 91 – 93.  At that proceeding, Mr. Bell had stated under oath that his injuries from the October 3rd incident had been caused by a machete.  *Id.*  at p. 92.  He explained, however, that he never saw the knife and that he was later told by Mrs. Bell and others he had been stabbed by a machete.  *Id*. at p. 93.

[3]     Hospital records documenting Mr. Bell's injuries and extensive surgeries were entered into the record  by the State without a supporting witness's testimony.   ECF 16, Ex. 14, pp. 123 – 24, 131.

established.  *Id*. at p. 24.  Mrs. Bell admitted on cross-examination that police had come to her home on that date and she was holding the machete because she did not know who was in the home as it was dark.  *Id*. at p. 25.  She further admitted, and Mr. Bell confirmed, that the machete had been in their bedroom for quite some time for purposes of home protection.   Mrs. Bell denied ever threatening Mr. Bell with the machete or having it in her possession on the date Mr. Bell was seriously injured.  *Id*. at pp. 29 – 30.  Testimony was elicited from both Mr. and Mrs. Bell to the effect that at the time of this assault their relationship was blossoming and that they were in love, having met four months prior, but the injuries sustained by Mr. Bell put a strain on their relationship.  ECF 16 at Ex. 14, pp. 34 – 38 (redirect of Mrs. Bell), pp. 82 – 83 (direct of Mr. Bell), and pp. 106 – 107 (redirect of Mr. Bell).  The issues they were experiencing resulted in the altercation that took place on April 13, 2007.  *Id*.

The jury returned guilty verdicts on the charges of attempted first and second degree murder and first and second degree assault.  ECF 16 at Ex. 14, p. 188.  On the charge of wear, carry a deadly weapon with the intent to injure, the jury found Handy not guilty.  *Id*. at pp. 188 – 89.  Handy was sentenced on April 1, 2008.  *Id*. at Ex. 15.  Defense counsel raised the issue of the seeming inconsistency in the verdicts during argument on the defense's motion for a new trial.  *Id*. at pp. 27 – 28.  Specifically, counsel pointed out that if the jury found Handy guilty of the attempted murder and assault charges, that would necessarily imply that a deadly weapon was used in the crime, but the jury found him not guilty on the weapon offense.  *Id*.   The State's Attorney then offered an explanation for the not guilty verdict on the weapon offense, pointing out that the charge was "carried openly with intent to injure" and both Mr. and Mrs. Bell testified they never saw the knife.  *Id*. at p. 28.  He then opined that the jury perhaps took the phrase "carried openly" literally.  *Id*.

In the context of the defense motion for a new trial, the trial judge asked the State's Attorney to obtain copies of the cell phone bill for the court's review.  ECF 16 at Ex. 15, pp. 6 - 15.  The trial judge explained he had a "hang up" on the issue of the phone records in response to defense counsel's question regarding why the records were being discussed.  *Id*. at p. 14.  The pattern of phone calls, as well as the numbers called, supported the State's theory that the assault was spawned by a dispute over the bill and Handy's possession of the phone.

Additionally, counsel met with a medical examiner, Dr. Fowler, at the behest of the trial judge.  *Id*. at p. 16, *see also* ECF 19-1 at pp. 31 – 32 (letter from Judge Bernstein to Dr. Fowler). During that meeting, Dr. Fowler discussed with counsel the likelihood of whether the wounds inflicted on Mr. Bell could have been inflicted by the machete Mrs. Bell admitted to possessing. ECF 16 at Ex. 15, pp. 16 – 17.  Defense counsel reported to the trial judge that Dr. Fowler could not exclude the machete as the weapon that caused the injuries suffered by Mr. Bell, but he also could not definitively say it was the weapon used in the attack.   *Id*. at pp. 17 – 19.  The State's Attorney, however, that most of what Dr. Fowler said discounted the machete as the weapon used based on the nature of the wounds to Mr. Bell's abdomen and spleen.  *Id*. at pp. 20 – 21. Specifically, the State's Attorney represented that it was Dr. Fowler's opinion that had a machete been used in the attack, damage to the ribs would have been expected but none was noted.  *Id*. at pp. 22 – 24.  Both counsel agreed that Dr. Fowler's opinion was that anything from an average steak knife, with a blade over four inches, could have caused Mr. Bell's injuries.  *Id*. at pp. 25 – 26.  The court subsequently denied the defense motion for new trial (*id*. at p. 40) and sentenced Handy to serve life imprisonment on attempted first degree murder with concurrent terms for the remaining counts.  *Id*. at pp. 53 – 54.

<u>State Appellate and Collateral Review</u>

On direct appeal, Handy raised the following questions:

> Did the trial court err in allowing the jury to return inconsistent verdicts of guilty on the attempted murder charges but not guilty on the charge of openly wearing or carrying a deadly weapon with intent to injure?
>
> Did the trial court err in allowing the prosecutor to make improper and prejudicial comments in closing argument that deprived appellant of a fair trial?
>
> Did the trial court err in allowing Mr. and Mrs. Bell to give expert medical testimony?
>
> Did the trial court err in refusing to give a jury instruction on imperfect self-defense?
>
> Did the trial court err in failing to merge appellant's convictions and sentences for attempted second degree murder and second degree assault?

ECF 3 at Ex. 2, p. 2.

In its April 14, 2010 unreported opinion, the Court of Special Appeals merged the judgments for attempted second degree murder and second degree assault into the judgments for attempted first degree murder and first degree assault and otherwise affirmed the conviction. ECF 3 at Ex. 2.  Handy filed a petition for writ of certiorari with the Maryland Court of Appeals which was denied on July 23, 2010.  *Id*. at Ex. 3.

On October 7, 2010, Handy filed a petition for post-conviction relief in the Circuit Court for Baltimore City.  ECF 3 at Ex. 4; ECF 16 at Ex. 16 and 17.  In the petition, as supplemented, Handy alleged trial counsel was ineffective for failing to: object to an improper voir dire question; present evidence or argument regarding Handy's identity defense; file a motion for modification of sentence; and file for review by a three-judge panel.  ECF 16 at Ex. 16, pp. 3 – 4; Ex. 17, pp.   In addition, Handy claimed that appellate counsel was ineffective for failing to raise a plain error challenge to the trial court's voir dire.  *Id*.  With respect to the "voir dire" issue,

Handy alleged that the trial judge erred when he asked potential jurors to stand if they felt they could not convict in the absence of scientific evidence, regardless of other evidence presented and regardless of his instruction on the law.  ECF 16 at Ex. 16, pp. 4 – 6.  The question asked by Judge Bernstein referenced the television show "CSI Miami" and Law and Order, and characterized those shows as "fiction and fantasy."  *Id*. at p. 7.  In response to the question, one potential juror stood.  *Id*.

On August 19, 2013, the post-conviction court granted Handy the right to file a belated motion for modification of sentence and for three-judge panel review and otherwise denied the relief sought.  *Id*.

Handy filed an application for leave to appeal the post-conviction court's decision with the Court of Special Appeals.  ECF 3 at Ex. 5.  In his application Handy alleged that trial counsel was ineffective for failing to object to a "CSI" voir dire question and by failing to introduce exculpatory medical records.  *Id*.  The application for leave to appeal was summarily denied by the Court of Special Appeals on May 16, 2014.  ECF 3 at Ex. 6.  Handy filed a motion for reconsideration of that denial on June 2, 2014, which remained pending at the time of Respondents' initial answer.  *Id*. at Ex. 7.

<u>Claims Raised in this Court</u>

In the Petition for Writ of Habeas Corpus filed in this Court, Handy claims that: the trial court erred in allowing the jury to return an inconsistent verdict; the trial court erred when it allowed the prosecutor to make improper and prejudicial comments during closing argument; the trial court erred when it allowed lay witnesses to provide expert testimony; and counsel provided ineffective assistance.  ECF 1 at pp. 5 – 6.  Handy's ineffective assistance of counsel claim consists of the following grounds: trial counsel was ineffective when he failed to object to the

CSI voir dire question, failed to present evidence to support Handy's identity defense, and failed to anticipate changes in the law. *Id*. at pp. 6 – 7. Handy contends that the post-conviction court erred when it found trial counsel was not ineffective for failing to utilize medical records that were exculpatory because at the post-conviction hearing trial counsel admitted he missed a record where a psychiatrist stated that the victim told her that he was stabbed by his wife. *Id*. at p. 7. Each of these grounds for relief are addressed below.

### Standard of Review

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The federal habeas statute at 28 U.S.C. § 2254 sets forth a "highly deferential standard for evaluating state-court rulings" *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005). The standard is "difficult to meet," and requires courts to give state-court decisions the benefit of the doubt. *Cullen v. Pinholster*, 563 U.S. 170, __, 131 S.Ct. 1388, 1398 (2011) (internal quotation marks and citations omitted); *see also White v Woodall,* __ U.S.__, __, 134 S.Ct 1697, 1702 (2014), quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011) (state prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement.").

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"; or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254 (d). A state

adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state

court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court

precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S.

362, 405 (2000).

Under the "unreasonable application" analysis under 2254(d)(1), a "state court's

determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded

jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at

103 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, "an unreasonable

application of federal law is different from an incorrect application of federal law." *Id*. at 785

(internal quotation marks omitted).

Further under § 2254(d)(2), "a state-court factual determination is not unreasonable

merely because the federal habeas court would have reached a different conclusion in the first

instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the

record might disagree about the finding in question," a federal habeas court may not conclude

that the state court decision was based on an unreasonable determination of the facts. *Id*. **"[A] a**

**federal habeas court may not issue the writ simply because [it] concludes in its independent**

**judgment that the relevant state-court decision applied established federal law erroneously or**

**incorrectly***." Renico v. Lett,* 599 U.S. 766, 773 (2010).

The habeas statute provides that "a determination of a factual issue made by a State court

shall be presumed to be correct," and the petitioner bears "the burden of rebutting the

presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where

the state court conducted an evidentiary hearing and explained its reasoning with some care, it

should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id.* at 379.

The Antiterrorism and Effective Death Penalty Act (AEDPA) erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court. AEDPA requires "a state prisoner [to] show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error ... beyond any possibility for fairminded disagreement." *Harrington* 562 U.S. at 103. "If this standard is difficult to meet"— and it is—"that is because it was meant to be." *Id.*, 102. A federal court reviewing a habeas petition will not lightly conclude that a State's criminal justice system has experienced the "extreme malfunctio[n]" for which federal habeas relief is the remedy. *Id.* (internal quotation marks omitted).

**Analysis**

<u>Trial Court Error Claims</u>

Handy claims that the trial court erred by allowing the jury to return an inconsistent verdict; allowing the prosecutor to make improper and prejudicial comments during closing argument; and allowing lay witnesses to provide expert testimony.  These alleged errors were addressed by the Court of Special Appeals in its opinion affirming Handy's convictions and were, in the appellate court's view, unpreserved for its review with respect to the first two allegations and without merit with respect to the third.  ECF 3 at Ex. 2.

With respect to the inconsistent verdict, the Court of Special Appeals noted that Handy "waived his challenge to any inconsistent verdicts by failing to make a timely and specific

objection, either at the time the verdicts were rendered or thereafter." ECF 3 at Ex. 2, p. 7. The court further noted that the Court of Appeals' opinion upon which Handy relied, specifically noted that while legally inconsistent verdicts were no longer permissible, the court's holding was made retroactive only to "similarly situated cases on direct appeal where the issue was preserved." *Id*. at p. 8, citing *Price v. State*, 405 Md. 10, 29 (2008). The Court of Appeals noted in *Price* that "we should not permit the defendant to accept the jury's lenity in the trial court, only to seek a windfall reversal on appeal by arguing that the jury's verdicts are inconsistent." *Id*. In Handy's case, the Court of Special Appeals noted that his "failure to object to the verdicts may be construed as a strategic decision not to challenge any perceived inconsistency, because the acquittal on the weapon charge worked to his favor." ECF 3 at Ex. 2, p. 10. Finally, the Court of Special Appeals noted that "[g]iven the evidence, the jury could have concluded that, although [Handy] wore or carried the weapon, he did not do so openly." *Id*. at p. 13. Thus, the not guilty verdict on the charge of openly carrying a deadly weapon "was not factually inconsistent with the guilty verdicts on the attempted murder and assault charges." *Id*.

Handy's claim that the trial court erred when it allowed the prosecutor to "impugn defense counsel's integrity by characterizing his closing argument as 'horrible' and 'shameful'" was also addressed by the Court of Special Appeals. ECF 3 at Ex. 2, p. 15. The comments made by the State's Attorney were made in rebuttal to defense counsel's closing argument that Mr. Bell's injuries were the result of Mrs. Bell attacking him with a machete. The Court of Special Appeals reviewed the transcript and concluded that "the prosecutor's suggestion that defense counsel wrongly sought to prosecute Ms. B[ell] for the crime was directed at the defense theory of the case, not at defense counsel's personal character or credibility." *Id*. at p. 21. The court noted that while defense counsel objected on unspecified grounds when the prosecutor argued

that defense counsel presented himself as a would-be prosecutor of Mrs. Bell, the remark did not warrant reversal of Handy's convictions as it did not exceed the bounds of legitimate advocacy and unfairly prejudice the jury against Handy.  *Id*., citing *Lee v. State*, 405 Md. 145, 165 (2008).

The issue regarding alleged impermissible medical testimony related to the testimony of both Mr. and Mrs. Bell regarding the injuries sustained by Mr. Bell and the subsequent surgeries he required.  The Court of Special Appeals analyzed both the in-court demonstration where Mr. Bell removed his shirt in front of the jury, revealing the scars he sustained and the testimony provided by Mr. and Mrs. Bell regarding his medical condition.  In the appellate court's view, the trial court did not abuse its discretion by permitting the shirtless demonstration in court because it "aided the jury in determining whether [Handy] attacked Mr. Bell with sufficient deliberation and premeditation to convict him of attempted first degree murder."  ECF 3 at Ex. 2, p. 26.  The court further noted that "such evidence could support a finding that, even if [Handy] did not have enough time to form a premeditated intent to kill during the initial attack, the serious nature and location of the stab wounds inflicted during the second attack sufficiently established  a premeditated intent to kill."  *Id.* , *see also id.* at p. 24, quoting *Smallwood v. State*, 343 Md. 97, 104 (1996) ("[A]n intent to kill may be inferred from the use of a deadly weapon directed at a vital part of the human body.").

With regard to the testimony provided by Mr. and Mrs. Bell about Mr. Bell's medical condition, the Court of Special Appeals disagreed with Handy that the testimony amounted to improper expert testimony by lay witnesses.  The court cited Maryland Rule 5-701 which permits lay witnesses to testify regarding their direct perceptions of events and explained that Mr. and Mrs. Bell "merely recounted what they perceived Mr. Bell's medical treatments to have been."  ECF 3 at Ex. 2, p. 29.  Additionally, the court noted that the trial court gave a limiting

instruction clarifying for the jury that the purpose of the testimony was not to give an expert medical opinion, but merely to explain what the witnesses understood Mr. Bell's medical situation to be. *Id.*

The asserted grounds for federal habeas relief do not state a federal claim. The issues regarding the verdicts, closing argument, and testimony were resolved on the basis of state law and are state law claims. Violation of a state law which does not infringe upon a specific constitutional right is cognizable in federal habeas corpus proceedings only if it amounts to a "fundamental defect which inherently results in a complete miscarriage of justice". *Hailey v. Dorsey*, 580 F.2d 112, 115 (4th Cir. 1978) (quoting *Hill v. United States*, 368 U. S. 424, 428 (1962). There is no evidence of such a fundamental defect in the case sub judice and federal habeas relief shall be denied on the grounds asserted.

<u>Ineffective Assistance of Counsel Claims</u>

When a petitioner alleges a claim of ineffective assistance of counsel, he must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). The second prong requires the court to consider whether there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A strong presumption of adequacy attaches to counsel's conduct, so strong in fact that a petitioner alleging ineffective assistance of counsel must show that the proceeding was rendered fundamentally unfair by counsel's affirmative omissions or errors. *Id.* at 696. Although "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," it is equally true that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional

judgments support the limitations on investigation." *Id*. at 690-91. Where circumstances are such that counsel should conduct further investigation to determine "whether the best strategy instead would be to jettison [a chosen] argument so as to focus on other, more promising issues," failure to conduct further investigation can amount to constitutionally deficient assistance. *See Rompilla v. Beard*, 545 U.S. 374, 395 (2005) (O'Connor, J., concurring). Counsel should be strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment and the burden to show that counsel's performance was deficient rests squarely on the defendant. *See Burt v. Titlow*, __ U.S. __, 134 S.Ct. 10, 17 (2013).

A showing of prejudice requires that 1) counsel's errors were so serious as to deprive the defendant of a fair trial whose result is reliable, and 2) there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *See Strickland*, 466 U.S. at 687, 694. "The benchmark [of an ineffective assistance claim] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. at 686. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687; *see also Harrington*, 562 U.S. at 104 (citing *Strickland*, 466 U.S. at 687). A determination need not be made concerning the attorney's performance if it is clear that no prejudice would have resulted had the attorney been deficient. *Strickland*, 466 U.S. at 697.

Handy's ineffective assistance of counsel claim consists of the following grounds: trial counsel was ineffective when he failed to object to the CSI voir dire question, failed to present

evidence to support Handy's identity defense, and failed to anticipate changes in the law. ECF 1 at pp. 6 – 7.

Handy's claim regarding the voir dire commentary is based on the following statement made by the trial judge:

> Now, I'm going to assume based on prior experience that many of you watch way too much television, including the so called, realistic crime shows like, you know, Law and Order and CSI Miami, and CSI Glen Burnie and the rest of them.  Now I trust you understand that these crime shows are fiction and fantasy.  And for dramatic effect they purport to rely upon "scientific evidence" to convict guilty persons.
>
> Well, this is acceptable as fantasy, as entertainment.  You must not allow these fantasies to interfere with your duties as a juror.  Therefore, if you are currently of the opinion that you cannot convict a Defendant without "scientific evidence" regardless of the other evidence in the case and regardless of the instructions I give you as law, please stand.

ECF 3, Ex. 4, p. 4 (citing Tr. 2/4/08, p. 29).   Defense counsel did not object and Handy asserts that this was ineffective assistance of counsel in light of the fact that the Maryland appellate courts found a similar voir dire question impermissible because it "'suggested that the jury's only option was to convict, regardless of whether scientific evidence was adduced.'"   *Id*. at p. 5, quoting *Charles & Drake v. State*, 414 Md. 726, 737 (2010).

The post-conviction court acknowledged that the case law cited by Handy were appellate decisions on cases where the trials took place at the same approximate time as his trial. ECF 3 at Ex. 4, p. 5.  In those two cases the defense attorneys objected to similar voir dire questions and, in Handy's view, his defense counsel should have also recognized of the potential for adverse consequences to him posed by the question.  *Id*., citing *Charles & Drake* and *McFadden & Miles v. State*, 197 Md. App. 238 (2011).   The post-conviction court rejected Handy's argument because, "[a]s the appellate courts have repeated on numerous occasions, trial counsel is not responsible for anticipating changes in the law." ECF 3 at Ex. 4, p. 5.  At the time of Handy's

trial, there had been no ruling by the appellate courts regarding the CSI voir dire question. In light of the fact that there was "no evidence . . . indicating that there was any prevailing professional norm to object to a CSI voir dire question at the time of [Handy's] trial," the post-conviction court found that counsel's performance was not deficient. *Id*. at p. 6. "The mere fact that some attorneys were objecting to similar voir dire questions is insufficient to prove that the failure to object to a CSI voir dire question fell below an objective standard of reasonableness." *Id*. The post-conviction court's application of the *Strickland* standard is without error and there is no basis for federal habeas relief stated with this asserted ground.

Handy alleges that trial counsel was ineffective for failing to introduce or otherwise utilize certain medical records that indicate Mr. Bell's injuries were caused by Mrs. Bell. He further contends that the post-conviction court erred when it found trial counsel was not ineffective in this regard in light of trial counsel's admission at the post-conviction hearing that he missed a record where a psychiatrist stated that the victim told her that he was stabbed by his wife. ECF 1 at p. 7. At issue were two medical records which Handy has provided to this Court as exhibits. ECF 19-1 at p. 9 (affidavit of Nia Sipp, M.D.) and pp. 33 – 34 ("final report" by Thorsten Fleiter, M.D.). The psychotherapy progress note made by Dr. Sipp on December 27, 2006, states in pertinent part that "P[atien]t stabbed by GF ex fiancé, who remains free." *Id*. at p. 9. The notes made by Dr. Fleiter in reference to his treatment of Mr. Bell states "machete injury last year with multiple surgeries" regarding Mr. Bell's medical history. *Id*. at pp. 33 – 34. These records, in Handy's view, would have established that he was not the perpetrator, rather Mrs. Bell was the assailant. At the post-conviction hearing, Handy testified that when he arrived at the Bell's home, only Mrs. Bell was present and when Mr. Bell arrived, the two began arguing. ECF 3 at Ex. 4, p. 10. Handy further testified that Mr. Bell was angry because he believed

something sexual was going on between Handy and Mrs. Bell and that Mr. Bell hit her during the course of their argument. *Id*. After Mrs. Bell was struck, Handy claimed she went into the bedroom and Handy then left. *Id*.

The post-conviction court noted it was "not persuaded that trial counsel was ineffective for failing to utilize the two medical records." ECF 3, Ex. 4, p. 10. The court correctly noted that *Strickland* requires both deficient performance and prejudice. *Id*. Assuming counsel's performance was deficient in failing to introduce the records, Handy was not prejudiced by it because trial counsel "presented significant evidence in support of the defense theory of the case, and specifically presented evidence that implicated [Mrs. Bell] as the potential perpetrator." *Id*. Moreover, the post-conviction court noted that the medical reports at issue were "ambiguous and unlikely to have been particularly helpful at trial." *Id*. at p. 11.

Dr. Sipp testified by phone in the post-conviction case and stated that while she did not have specific recollection of the December meeting between herself and Mr. and Mrs. Bell, she believed her notes indicate that Mrs. Bell was present. *Id*. Dr. Sipp further explained that "her notes indicated that [Mr. Bell] was angry at the person who stabbed him, and if the person who stabbed him was the person in the room, Dr. Sipp would have referred directly to the person in the room, rather than to 'GF ex fiance' to describe the individual." *Id*. The post-conviction court observed that "[g]iven the significant ambiguity regarding this note, the court is not persuaded that the use of this note or Dr. Sipp's testimony would have a significant probability of altering the outcome of the trial." *Id*. The court concluded that beyond mere speculation, the evidence which was omitted was not sufficient to undermine confidence in the outcome of the trial as required by *Strickland*. *Id*. The post-conviction court's application of *Strickland* to the facts of this case is without error and the asserted ground for federal habeas relief must fail.

**Conclusion**

Upon review of the Petition For Writ Of Habeas Corpus, the Response along with the exhibits submitted, as well as Petitioner's reply, this Court determines that Handy is not entitled to federal habeas relief.  There is no basis upon which to find constitutional deficiencies in the state court proceedings, Petitioner having failed to rebut the presumption of correctness of the findings of fact underlying the rejection of his grounds for post-conviction or appellate relief.

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U. S.C. § 2253(c)(2).  The petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted), or that "the issues presented are adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Because this Court finds that there has been no substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue.  *See* 28 U. S.C.§ 2253(c)(2).

A separate Order follows.


December 18, 2015                    _____/s/_____
Date                                         RICHARD D. BENNETT
                                             UNITED STATES DISTRICT JUDGE